UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

QUELLE ROBINSON, et al.,

        Plaintiffs,

    v.                                                    Case No. 19-cv-0356-bhl

ERIC SWEENEY, et al.,

        Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

On April 8, 2018, during a routine traffic stop, Milwaukee police officers arrested Jalen Copeland when he defied their orders to exit the passenger seat of the Chevy Malibu in which he was riding. This case is about what happened to the Malibu's other occupants. In the aftermath of his arrest, officers seized Jalen's girlfriend and her two sisters, searched their vehicle, and subjected them to pat downs. Forty-five minutes after the initial stop, having uncovered nothing more sinister than a wooden broom handle, officers finally allowed the sisters to go on their way. The three women later filed this suit, alleging violations of their Fourth Amendment rights. The defendant officers have moved for summary judgment, insisting their conduct complied with the Fourth Amendment and, if it didn't, they are entitled to qualified immunity. While the officers' conduct was not entirely without problems, the record reveals no triable issues of material fact, and their motion will be granted.

### FACTUAL BACKGROUND[1]

On April 8, 2018, at approximately 9:43 p.m., City of Milwaukee Police Officers Eric Sweeney, Rolando Franco, and Matthew Van Drisse pulled over a silver Chevrolet Malibu traveling through downtown Milwaukee without its headlights on. (ECF No. 27 at 2; ECF No. 30 at 2.) The car contained four occupants: driver Adea Dunn, Jalen Copeland, Quelle Robinson, and

---

[1] These facts are drawn from the parties' proposed statements of undisputed facts (and responses), (ECF Nos. 27 & 30), as well as video exhibits, (ECF No. 20). Disputed facts are viewed in the light most favorable to Plaintiffs as the non-moving party.

minor P.I. (ECF No. 30 at 1-2.) Copeland was Dunn's then-boyfriend and seated in the front passenger seat. (*Id.*) Robinson is Dunn's older sister and was seated in the driver's side backseat. (*Id.*) P.I. is Dunn's younger sister and was seated in the passenger's side backseat. (*Id.* at 2.) Neither Adea nor Jalen were wearing seatbelts. (ECF No. 27 at 4.)

Officer Sweeney approached the driver's side window and asked Adea for identification, which she provided. (*Id.*) Officer Franco, at the passenger side window, asked Jalen to produce identification as well because he was not wearing a seatbelt. (*Id.* at 5.) Jalen stated that he had no identification on him, so Officer Franco asked him to exit the vehicle. (*Id.* at 5-6.) Jalen refused. (*Id.* at 6.) After asking an additional *six* times, Officer Franco decided to remove Jalen from the vehicle himself. (*Id.* at 6-7.) A struggle ensued, and both Officer Franco and Jalen went to the ground. (*Id.* at 7.) Together with Officers Sweeney and Van Drisse, Officer Franco handcuffed Jalen and seated him on the curb. (*Id.* at 8.)

Once Jalen had been subdued, Officer Sweeney searched the front passenger seat area of Adea's car. (ECF No. 30 at 3.) Both Adea and Quelle challenged Officer Sweeney's authority to conduct this search. (ECF No. 27 at 11.) Officer Sweeney's search uncovered a wooden broom handle, about one inch thick and 18 inches long. (*Id.*) Adea testified that her mother put the broom handle in her car for her to use as protection while entering and exiting the vehicle. (*Id.* at 12.) Officer Sweeney did not think it likely that Jalen's resistance was related to something as innocuous as a broom handle, so he continued his search, assisted by Officer Franco. (*Id.*) Officer Franco claimed that he was concerned that Jalen had passed a weapon off to either Adea or Quelle. (*Id.* at 13.) For this reason, the officers summoned Officer Karlee Cabral, a female, to conduct a pat down search of Adea and Quelle. (*Id.* at 14.) Officer Cabral arrived at approximately 9:52 pm. (*Id.*) She then performed the requested pat downs of Adea and Quelle, which revealed no weapons. (*Id.* at 16.)

In total, the search and pat down took about 13 minutes to complete. (ECF No. 20, Exhibit SL-4 at 13:30.) The officers held onto Adea's driver's license much longer than this, however. (ECF No. 30 at 6.) Because Officer Franco used force to arrest Jalen, his supervisor, Sergeant Raymond Brock was dispatched to conduct a mandatory use-of-force investigation. (ECF No. 27 at 17.) Sergeant Brock spoke with the officers, Jalen, and finally Plaintiffs. (*Id.*) After they spoke with Sergeant Brock, and approximately 30 minutes after the search and pat downs were

completed, Adea's license was returned, and Plaintiffs were permitted to leave. (*Id.* at 17; ECF No. 30 at 7.) None of the plaintiffs received a citation. (ECF No. 30 at 7.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ANALYSIS

Plaintiffs allege defendants violated the Fourth Amendment in six ways: (I) the officers arrested Plaintiffs without probable cause; (II) Officer Sweeney violated the Fourth Amendment by threatening violence against Adea for objecting to an unlawful search; (III) Officer Franco violated Section 1983 when he improperly requested that Officer Cabral conduct pat downs of Adea and Quelle (IV); Officers Sweeney and Franco violated the Fourth Amendment by performing a warrantless search of Adea's car; (V) Officer Cabral's execution of the pat downs violated the Fourth Amendment; and (VI) Officer Van Drisse violated Section 1983 by failing to intervene and stop the alleged misconduct of the other three officers.[2] In their motion for summary judgment, Defendants argue that their actions were consistent with the Constitution, and, in any case, they are protected by qualified immunity. Because the undisputed facts confirm there were no constitutional violations concerning claims II-V, defendants are entitled to summary judgment on those claims. And because qualified immunity applies to the two remaining claims (I and VI), summary judgment will be granted on those contentions as well.

---

[2] Plaintiffs' complaint does not break these allegations into separate counts, but for ease of analysis, the Court has numbered the allegations and will refer to them accordingly.

I. **Defendants Are Entitled to Summary Judgment on Claims II-V.**

A. **Plaintiffs Have Abandoned their Claim Against Officer Sweeney for Threatening Violence.**

In their complaint, Plaintiffs allege that Officer Sweeney violated the Fourth Amendment by threatening violence against A.D. for objecting to the unlawful searches of the car. (ECF No. 1 at ¶23.) The record shows that during Officer Sweeney's first search of the passenger compartment, Quelle reached forward and attempted to pull Jalen's jacket off of the passenger seat. (ECF No. 27 at 9.) Officer Sweeney told Quelle to "sit down" unless she wanted "to be next." (*Id.* at 9-10.)³ In their motion for summary judgment, Defendants argued that Officer Sweeney's statements could not possibly constitute a Fourth Amendment seizure. (ECF No. 14 at 27-29.) Plaintiffs' response does not address this issue.

Because Plaintiffs do not take issue with Defendant's summary judgment arguments, they have waived their claim, and Defendants are entitled to summary judgment. *See De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims." (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003); *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 2003); *Donelson v. City of Chi.*, 272 F. Supp. 2d 717, 726 (N.D. Ill. 2003); *Oak Brook Hotel Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 846 F. Supp. 634, 641 (N.D. Ill. 1994))).

B. **There is No Dispute that Officer Franco Lawfully Ordered Officer Cabral to Conduct a Pat-Down Search.**

Plaintiffs next seek to hold Officer Franco liable for effecting Officer Cabral's allegedly unconstitutional pat downs. (ECF No. 1 at ¶27.) Section 1983 imposes liability on anyone who causes a constitutional deprivation while acting under color of state law. 42 U.S.C. §1983. Plaintiffs argue that Officer Franco's decision to call in Officer Cabral to execute *Terry* frisks "set in motion a series of events that [he] knew or should reasonably have known would cause others to deprive the plaintiff[s] of [their] constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988). Based on this theory, they insist, Officer Franco is liable for the deprivation under Section 1983.

---

³ While the complaint alleges these remarks were directed to Adea, Plaintiffs no longer dispute that Officer Sweeney was actually speaking to Quelle. (ECF No. 27 at 9-10.)

The Supreme Court has held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," he may, for his safety and that of others, conduct a limited frisk. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). But "[a]lthough the confrontation between a police officer and a citizen stopped for a traffic violation can be fraught with danger, this fact alone does not justify a pat-down, and the caselaw does not support the view that 'an officer may frisk the occupants of any car stopped for a traffic violation.'" *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999) (internal citations omitted) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 n.5 (1977)). In fact, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). Therefore, "a driver, once outside the stopped vehicle, may be patted down for weapons [only] if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Mimms*, 434 U.S. at 112). However, "[c]ertainty about the presence of a weapon is unnecessary; 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Ford*, 872 F.3d 412, 415 (7th Cir. 2017) (quoting *Terry*, 392 U.S. at 27).

Paring down the surplus verbiage and untangling the 'reasonableness' qualifiers reveal a relatively simple principle: an officer lawfully frisks a suspect when that officer reasonably concludes that the suspect might be armed and presently dangerous. Officer Franco asserts that his experience "in more than 100 similar situations" led him to conclude that Jalen might have had a weapon and passed it to Adea or Quelle. (ECF No. 27 at 13.) That his experience led him astray and his conclusion was incorrect merely demonstrates the hazards of extrapolation; it does not render his mistaken belief unreasonable. The Court is not convinced that immutable biological factors—like the size of Jalen's eyes, (ECF No. 27 at 3)—or intrinsically human actions—like Jalen's decision to turn and observe the unmarked police car that had just pulled him over, (ECF No. 30 at 2)—represented sufficient evidence of suspicious activity. *See United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) ("Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should

not be credited."). Jalen's obstinance in the face of an officer's request for him to exit the vehicle, however, was unquestionably strange behavior from which a trained policeman might reasonably deduce that criminal activity was afoot. Innocent parties do not usually defy lawful orders so blatantly. *See United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) ("a suspect's failure or refusal to comply with a police officer's order is . . . a factor that contributes to a reasonable suspicion that he may be dangerous"). On *seven* occasions, Officer Franco asked Jalen to step out of the car and identify himself, and each time, Jalen refused. From this, a prudent person might infer that Jalen had something to hide. *See United States v. Stachowiak*, 521 F.3d 852, 856-57 (8th Cir. 2008) ("we must determine whether the facts *collectively* provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis"). When a search of Jalen's person failed to unearth any weapons or contraband that would explain his behavior, it was reasonable to suspect he may have passed a weapon to another of the car's occupants. A frisk of those occupants was therefore necessary to ensure officer safety. Nothing about this chain of inferences or actions is improper as a matter of law. No reasonable jury could conclude otherwise, so summary judgment will be granted on this claim.

   **C. There Is No Dispute that Officers Sweeney and Franco Lawfully Searched Adea's Car.**

  Plaintiffs also allege that Officers Sweeney and Franco violated the Fourth Amendment when they searched Adea's car without a warrant. (ECF No. 1 at ¶24.) While courts recognize a presumptive rule against warrantless searches, not every search necessitates a warrant. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004). In fact, in *Michigan v. Long*, 463 U.S. 1032, 1049 (1983), the Supreme Court extended *Terry* to permit officers to "frisk" the passenger compartment of vehicles based solely on reasonable suspicion. *Id.* ("[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (quoting *Terry*, 392 U.S. at 21)). Under this standard, Officers Sweeney and Franco are entitled to summary judgment.

  If, as the law confirms, it was reasonable to conclude that Jalen may have passed a weapon to one of the vehicle's other occupants, it was equally reasonable to think he might have instead stashed the weapon somewhere in the passenger compartment. *See United States v. Arnold*, 388

F.3d 237, 240 (7th Cir. 2004). And while Jalen was under arrest and therefore incapable of accessing any weapons inside the vehicle, those hypothetical weapons would certainly have been within Plaintiffs' collective reach. *Long*, 463 U.S. at 1052. Thus, the same concern for officer safety that justified the *Terry* frisks also justified the protective search of the passenger compartment. Summary judgment on this count must be granted.

    **D.    No Reasonable Jury Could Conclude that Officer Cabral's Pat Downs Violated the Constitution.**

Plaintiffs also allege that, even if Officer Franco was justified in requesting a frisk, Officer Cabral's execution of that frisk exceeded the permissible scope of a pat down and violated their Fourth Amendment rights. (ECF No. 1 at ¶¶31-32.) The purpose of a frisk "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Once an officer has patted down a suspect for weapons and determined the suspect is unarmed, the officer exceeds the permissible scope of a *Terry* frisk if she continues to search the suspect. *Minnesota v. Dickerson*, 508 U.S. 366, 378-79 (1993). Assuming an officer has determined that a defendant's pocket contains no weapons, that officer's "squeezing, sliding and otherwise manipulating the contents of [that] pocket," is prohibited. *Id.* at 378. The Seventh Circuit has made clear that "[a]n officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999).

Plaintiffs accuse Officer Cabral of digging in pockets, exploring shoes, and exposing skin. (ECF No. 28 at 8-9.) Defendants deny this. (ECF No. 29 at 9-13.) Under normal circumstances, it would be improper for the Court to resolve such a factual dispute at summary judgment. But this is a case where the video evidence speaks for itself. (*See* ECF No. 20 Exhibit MV2, Exhibit KC, and Exhibit SL-4.) Officer Cabral's pat downs can be viewed from multiple angles, and none of them reveal conduct that exceeds the permissible scope of a *Terry* frisk. Plaintiffs' "version of events is so utterly discredited by the record that no reasonable jury" could believe it. *Scott*, 550 U.S. at 380. Therefore, Defendants are entitled to summary judgment on this claim as well.

## II. Defendants Are Not Entitled to Summary Judgment on the Merits of Claims I and VI but Are Nevertheless Protected by Qualified Immunity.

### A. A Reasonable Jury Could Find that Defendants' Detention of Plaintiffs Was an Unlawful Arrest in Violation of the Fourth Amendment.

The first claim in Plaintiffs' complaint is that Defendants "acted contrary to the Fourth Amendment by arresting Plaintiffs without probably cause. (ECF No. 1 at ¶22.) In the summary judgment briefing, Plaintiffs do not challenge the lawfulness of the original traffic stop, nor do they dispute the validity of Jalen's arrest. Instead, they argue that the 30-minute delay between the conclusion of the officers' investigation and the return of Adea's license constituted an arrest without probable cause. (ECF No. 28 at 12-15.) In other words, Plaintiffs' claim is that holding Adea's license after reasonable suspicion had abated resulted in an unconstitutional arrest.

"A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). "When determining the reasonableness of the length of detention, the court should consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." *Id.* A *Terry* stop can, of course, generate facts that create probable cause of a crime; however, "[i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). If he is not, the stop may transform into an arrest. "An arrest occurs when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (quoting *United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008)).

In this case, the justification for the *Terry* stop evaporated after the police completed a search of the vehicle and pat downs of the occupants and dispelled their suspicions. *See United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018). But rather than send them on their way, the officers prolonged Plaintiffs' detention so they could contribute to Sergeant Brock's use-of-force investigation. (ECF No. 30 at 6.) The authority for this extended detention could not have come from *Terry*. *See United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc) ("Questioning that prolongs the detention, yet cannot be justified *by the purpose of such an investigatory stop*, is unreasonable under the fourth amendment.") (emphasis added). The purpose of this investigatory

stop was to search for drugs and/or weapons that Jalen may have passed to the Plaintiffs, not to interview the Plaintiffs about the manner of Jalen's arrest. But Defendants contend that their hands were tied; "officers could not release Quelle, Adea, and P.I. from the scene until Sergeant Brock responded to the scene and was allowed to speak with them." (ECF No. 27 at 17.) Plaintiffs deny both that they had any legal obligation to speak with Sergeant Brock and that the officers had any right to compel them to participate in the use-of-force investigation. (*Id.*)

In support of their actions, Defendants cite to *Jewett v. Anders*, in which the Seventh Circuit held that "'when delay is attributable to the evasive actions of a suspect, the police do not exceed the permissible duration of an investigatory stop.'" *Jewett*, 521 F.3d 818, 827 (7th Cir. 2008) (quoting *Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006)). In that case, the plaintiff's evasive actions led to a chase, apprehension, frisk, and citation, but the Court found no evidence that the responding officer detained the plaintiff any longer than necessary to accomplish legitimate law enforcement objectives. *Id.*

In response, Plaintiffs cite *Florida v. Royer*, in which the Supreme Court held that a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Royer*, 460 U.S. 492, 497-98 (1983). Further, the individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id.* at 498.

Whatever else it may be, this case is not analogous to *Jewett*. Jalen's evasive actions certainly prolonged the duration of *his* encounter with the police, and this extension was permissible under *Jewett*. But Defendants do not allege that any of *these Plaintiffs'* actions were comparably evasive. In fact, Defendants admit that the 30-minute detention between the completion of the investigation and the return of Adea's license occurred, not because they were diligently pursuing leads, but because they wanted Plaintiffs to speak with Sergeant Brock. (ECF No. 15 at 8.) Police are not directors on a film set, nor are they puppeteers behind a curtain. They do not possess final authority to determine who speaks with whom and when. *See Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 966 (N.D. Ill. 2008) (holding that police could have sought a citizen's voluntary cooperation but could not coerce such cooperation). But the law recognizes that, in limited circumstances, they may temporarily detain witnesses to a crime if such detention serves a "special need." *See Illinois v. Lidster*, 540 U.S. 419, 425-26 (2004) (analogizing to *Royer*

to validate a brief roadblock detention in service of an ongoing criminal investigation). A special needs detention is justified, not by reasonable suspicion or probable cause, but rather some exigent, legitimate law enforcement purpose. *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). Recognizing the tendency of exceptional, discretionary authority to swallow the rule from which it is excepted, the Supreme Court has upheld special needs detentions in only select instances. *See Lidster*, 540 U.S. at 427 (permitting police to spend a few seconds asking stopped motorists if they could identify a suspect in a recent, fatal hit-and-run accident); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990) (permitting sobriety checkpoint); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (permitting Border Patrol checkpoint). Thus, the question before the Court is whether the facts of this case warrant inclusion in that narrow canon.

The reasonableness of a special needs detention turns on "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with liberty." *Lidster*, 540 U.S. 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). Generally, the first factor favors a brief detention where police seek witness cooperation in investigation of serious felonies. *See Lidster*, 540 U.S. 419 (allowing brief checkpoint to ask questions about a recent fatal hit-and-run accident); *Delaware v. Prouse*, 440 U.S. 648 (1979) (rejecting Delaware's use of spot checks to ensure that drivers of vehicles had licenses and that vehicles were fit for safe operation); *Sitz*, 496 U.S. 444 (allowing DUI checkpoints); *Edmond*, 531 U.S. 32 (rejecting city's use of checkpoints with the primary purpose of general crime control). The second factor is, at least in part, informed by the first. That is, the greater the gravity of the public concern, the greater the degree to which the seizure will advance the public interest. The Supreme Court has found that the public interest is significantly advanced where "police appropriately tailored their checkpoint stops to fit important criminal investigatory work." *Lidster*, 540 U.S. at 427. As for the third factor, the constitutional interest in liberty cannot be measured on a stopwatch. Precedent suggests, however, an upper bound of 90 minutes for any given special needs detention. *See Walker v. City of Orem*, 451 F.3d 1139, 1149 (10th Cir. 2006) ("'we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case'") (quoting *United States v. Place*, 462 U.S. 696, 709-10 (1983)). On the other hand, stops only minimally interfere with liberty of the sort the Fourth Amendment seeks to protect when they last "a very few minutes at most" and "[c]ontact with the police last[s] only a few seconds." *Lidster*, 540 U.S. at 427.

Stacked up against *Lidster*, the facts of this case fall just short. To be sure, use-of-force investigations are not purely bureaucratic busywork. Society undoubtedly has an interest in ensuring that those armed with lethal weapons and charged with enforcing the laws are not abusing their authority. Of course, whether use-of-force reports actually lead to increased accountability or decreased incidences of excessive force is an open question. More importantly for purposes of this case, the public interest in promptly interviewing witnesses for use-of-force investigations is not comparable to the interest in solving vehicular homicides seen in *Lidster*, nor did the seizure in this case advance that lesser public interest to the same degree as the brief questioning in *Lidster*. And while the stop in this case did not exceed the 90-minute threshold, it did persist for half an hour, which is decidedly longer than "a very few minutes at most." Suspicionless detention is an extraordinary power that should be wielded cautiously. For all of these reasons, a jury could conclude that Defendants unreasonably failed to exercise that power with sufficient recognition of Plaintiffs' liberty interests, and thus, their conduct was inconsistent with the factors identified in *Brown*. Accordingly, Defendants are not entitled to summary judgment on the merits of this claim.

### B. Whether Officer Van Drisse's Actions Violated Section 1983 Is Also a Jury Issue.

Plaintiffs allege that Officer Van Drisse violated Section 1983 when he failed to intervene and prevent Officers Sweeney, Franco, and Cabral from violating their constitutional rights. (ECF No. 1 at ¶33.) "'An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.'" *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). But if there is no underlying constitutional violation, there can be no failure to intervene. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004).

Because the Court found no constitutional violation with respect to Officer Sweeney's alleged threats, Officer Franco's request for a pat down, Officer Cabral's execution of the pat downs, or Officers Sweeney's and Franco's search of Adea's vehicle, Officer Van Drisse cannot be held liable under Section 1983 for failing to intervene and prevent those actions. However, because the decision to detain Plaintiffs while Officer Brock traveled to the scene could have violated the Fourth Amendment, a jury could also find Officer Van Drisse liable for failing to

intervene in that instance. Defendants argue that Officer Van Drisse, subjectively, saw nothing wrong with any of the tactics his fellow officers deployed. That is not a defense. Liability is established if the bystander officer *had reason to know* of the violations and a realistic opportunity to intervene. If Defendants' position were to prevail, police officers could avoid all failure-to-intervene liability simply by maintaining inadequate knowledge of the Constitution. Rewarding such ignorance is not the kind of perverse incentive Section 1983 contemplates. Nothing in the record indicates that Officer Van Drisse lacked the ability to intervene. And his potentially mistaken conception of the Constitution is certainly no defense. Accordingly, Officer Van Drisse is not entitled to summary judgment on this count.

      **C.**     **Defendants are Entitled to Qualified Immunity on Counts I and VI.**

Defendants argue, assuming some of their actions violated the Constitution, they are nevertheless entitled to qualified immunity for those actions. (*See generally* ECF No. 14.) The Court has already determined that, as to claims II-V, no constitutional violations occurred. Therefore, it is unnecessary to evaluate qualified immunity with respect to those contentions. However, because the Court has found potential constitutional violations in claims I and VI, it must now consider if, those violations notwithstanding, Defendants are entitled to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "What is important, in the final analysis, is 'whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions.'" *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (quoting *Wrigley v. Greanias*, 842 F.2d 955, 958 (7th Cir. 1988)). The question of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. This only occurs where existing precedent has "'placed the statutory or constitutional question beyond debate.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

With respect to claim I, Defendants' actions did not violate clearly established constitutional rights. To determine the extent of their authority to detain Plaintiffs as witnesses to a crime, Defendants had to apply a three-factor balancing test to a novel factual situation. It appears they did so erroneously. But that is not enough to condemn them. Conditioning liability on the capacity of police to make precise, split-second decisions on matters of first impression would turn every crime scene into a courthouse in which the trier of law has no claim to judicial immunity. Courts have, therefore, immunized officers from suit unless "existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 577 U.S. at 13). Plaintiffs have not identified any case from the Supreme Court or Seventh Circuit that squarely governs the specific facts at issue here. And this specificity "'is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 577 U.S. at 12). At the time they chose to detain Plaintiffs, the officers did not have clear notice that their actions were unconstitutional. Accordingly, they are entitled to qualified immunity on this claim.

Plaintiffs have also failed to identify any existing precedent that clearly governs the factual circumstances of this case with respect to Claim VI against Officer Van Drisse. If his fellow officers did not have sufficient notice that their actions violated the Constitution, surely it was not clearly established that Van Drisse was constitutionally required to intervene and prevent those potentially-but-not-obviously unconstitutional actions. He is therefore entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 13) is **GRANTED**, and the case is dismissed. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on March 29, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge